UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SODIQ FOLARIN AMUSAT,
    *Plaintiff,*

v.

MICHAEL MANGAN and
CITY OF LAWRENCE,
    *Defendants.*

Civil Action No. _____

# **COMPLAINT AND JURY DEMAND**

## **Introduction**

1. This is a civil rights lawsuit seeking damages for the unreasonable and excessive use of force and other tortious conduct by Lawrence Police Department Captain Michael Mangan ("Mangan"). On March 10, 2023, the Plaintiff Sodiq Folarin Amusat ("Mr. Amusat"), a 29-year-old Black man, was arrested by the Lawrence Police Department following a complaint by a neighbor about the volume of the music in his apartment. During the booking process, Mangan, a white Captain of the Lawrence Police Department, suddenly and without warning, viciously "clotheslined" Mr. Amusat. Mangan's unprovoked attack drove Mr. Amusat's head into a metal door and onto the concrete floor. Mr. Amusat was then needlessly tackled, forcibly pressed onto the ground and handcuffed. The entire incident is captured on a surveillance video recording.

2. Mr. Amusat also brings this action against the City of Lawrence ("City"). The City has allowed its police department to develop a policy or custom that results in a

failure to properly supervise, investigate, and discipline its officers. Such policies and customs emboldened Mangan to violate Mr. Amusat's constitutional rights.

**Parties**

3. Plaintiff Sodiq Folarin Amusat currently resides in Lawrence, Essex County, Massachusetts.

4. Defendant Michael Mangan was a Captain of the Lawrence police department at the time of the facts alleged in this Complaint. He is being sued in his individual capacity for violating Mr. Amusat's constitutional rights and for other tortious conduct.

5. Defendant City of Lawrence is a municipality in the Commonwealth of Massachusetts. The City is being sued as a local governmental agency under the *Monell* doctrine because Mangan's constitutional violations resulted from an official municipal policy, an unofficial custom and/or the municipality's failure to properly train or supervise Mangan.

**Jurisdiction and Venue**

6. This action is brought pursuant to 42 U.S.C. § 1983 and § 1988, and the Fourth Amendment to the United States Constitution. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and § 1343. Supplemental jurisdiction over claims arising under state law is authorized by 28 U.S.C. § 1367(a).

7. Venue is proper in the District of Massachusetts because all the acts and omissions giving rise to this action occurred in Lawrence, Massachusetts.

**Facts**

Mr. Amusat's Arrest

8. On March 10, 2023, at approximately 3:00 a.m., the Lawrence Police Department received a "report of a loud noise" at an apartment on Merrimack Street.

9. Officer Ramon Camilo, a uniformed patrolman in a marked police cruiser, was dispatched to the apartment building.

10. Officer Camilo was directed to the apartment occupied by Mr. Amusat. Officer Camillo then knocked on Mr. Amusat's apartment door and confronted him.

11. Mr. Amusat attempted to shut the door to his apartment but Officer Camilo put his boot into the door to prevent it from being shut. Officer Camilo then entered the apartment.

12. Two other Lawrence police officers, Stuery Rodriguez and Alejandro Tavarez, arrived at the apartment shortly thereafter.

13. Based ostensibly on a noise complaint, the three police officers placed Mr. Amusat under arrest, handcuffed him without a shirt on, placed him into a marked police cruiser and transported him to the police department.

Mr. Amusat's booking at the police station

14. At approximately 3:30 a.m., Mr. Amusat was brought to the booking room of the Lawrence Police Department for processing.

15. Mr. Amusat repeatedly asked the officers to explain the reasons for his arrest and the crime(s) that he was being charged with.

16. The officers failed and/or refused to explain to him the reason(s) for placing him under arrest.

17. After growing frustrated with Mr. Amusat's requests for more information about his arrest and charges, the officers placed Mr. Amusat into a holding cell for approximately twenty minutes.

18. Since it was a cold March morning and he was not wearing a shirt, Mr. Amusat repeatedly asked to put on a sweatshirt that had been brought to the police station by his friend.

19. The officers refused to let Mr. Amusat to wear the sweatshirt. Mr. Amusat was incredibly cold and uncomfortable at the police station due to the officers' refusal to let him to wear the sweatshirt.

20. At approximately 3:49 a.m., Mr. Amusat was taken out of the holding cell and brought back into the booking area to finish the booking process. The handcuffs were removed from Mr. Amusat a couple of minutes later.

21. During this time, Mr. Amusat continued to ask the officers to provide him with information about his arrest.

22. At approximately 4:05 a.m., Mr. Amusat was standing in the booking area, facing a podium and the officers behind the desk. Officer Rodriguez was standing to Mr. Amusat's left and Mangan was standing to his right.

23. Mangan falsely reports in his Supplementary Report #23001976/2 that Mr. Amusat "slightly turned and bladed his body (to his right)" and simultaneously "threw his outstretched right arm to grab at my face with his fingers in a grabbing motion." The

surveillance video footage of the incident demonstrates that Mr. Amusat did not outstretch his right arm and "grab at" Mangan's face.



24. Rather, the surveillance video footage demonstrates that Mr. Amusat was slightly turned to his left and was talking to Officer Rodriguez and using his hands in a non-threatening manner.

25. Mr. Amusat did not physically resist the police officers, did not attempt to flee and did not verbally threaten the officers. Mr. Amusat was flanked on both sides by two larger police officers. The surveillance video footage confirms that Mr. Amusat did not act in a manner that would cause the officers to fear for their safety. Despite the lack of danger to either officer, Mangan initiated a violent takedown of Mr. Amusat.

26. Suddenly and without warning, Mangan rapidly turned his body to his right toward Mr. Amusat and extended and stiffened his right arm.



27. Mangan quickly lunged toward Mr. Amusat with his right arm parallel to the ground and then wrapped his right arm around Mr. Amusat's neck. Mangan simultaneously placed his right leg behind Mr. Amasat's legs.



28. Mangan violently struck Mr. Amusat in the neck using his right arm to foreceably drive Mr. Amusat's head backward (i.e., a "clothesline" maneuver) toward the metal door behind him.



29. Mr. Amusat then struck his head on the metal door and on the concrete floor as he hit the ground.



30. Mangan and Officer Rodriguez then got on top of Mr. Amusat to immobilize him.



31. A third police officer came out from behind the booking desk and assisted Mangan and Officer Rodriguez.

32. The third police office then grabbed Mr. Amusat's left arm and held it up as Mangan and Officer Rodriguez pushed Mr. Amusat face down into the concrete floor. Mangan placed his knee into Mr. Amusat's back and held down Mr. Amusat's right arm with both hands.



33. Mr. Amusat, who was not resisting or fighting with the police officers, was placed into handcuffs and was brought to his feet.

34. The three police officers then escorted Mr. Amusat into a holding cell.

35. As a direct and proximate result of Mangan's conduct, Mr. Amusat suffered physical injuries including an injury to his knee and possibly other injuries. He also suffered physical pain, humiliation, embarrassment, and mental and emotional damage because of this incident.

<u>Irregularities in reporting the use of force</u>

36. Upon information and belief, Lawrence Police Department Lieutenant Paul Rossi ("Rossi"), in his capacity as the department's Internal Affairs officer, is required to file a monthly Use of Force report for the Lawrence Police Department and to submit the report to the Federal Bureau of Investigation ("FBI").

37. Rossi prepared a Use of Force report for submission to Acting Deputy Chief Michael McCarthy ("McCarthy") on May 12, 2023, more than two months after the incident involving Mr. Amusat and only after local media began to report about the incident. Upon information and belief, Rossi did not email the Use of Force report to McCarthy until May 22, 2023.

38. Upon information and belief, Mangan was involved in another separate incident of police misconduct that took place approximately twenty days after his unprovoked attack on Mr. Amusat.

39. The irregularities in the reporting of the use of force indicates that efforts were made to cover up Mangan's violent assault of Mr. Amusat most likely because Mangan was a long-serving, high ranking officer who also served as the president of the superior officers' union in the police department.

News reports about the incident

40. On May 11, 2023, several local news outlets, including NBC Boston, the Eagle-Tribune and Fox 25 news, reported about the incident involving Mangan and Mr. Amusat.

41. The news articles collectively reported that Mangan had been placed on paid administrative leave effective May 8, 2023 for use of force and that the incident involving Mr. Amusat was under investigation by the Lawrence police department.

42. Lawrence City Councilor Ana Levy, who observed the surveillance video of the incident, is quoted in the NBC Boston news report as saying: "This is unacceptable. Completely, completely unacceptable" and she referred to the incident as "inhumane."

Policies and Customs of the City of Lawrence

43. The policies and customs of the City of Lawrence were the moving force behind Mangan's conduct, which resulted in a violent, unprovoked attack on Mr. Amusat.

44. At all relevant times, Mangan, an agent and/or employee of the City, and under the supervision of the Lawrence Police Department, was acting under the color of law and within the scope of his authority as a police officer pursuant to established policies, rules, regulations, ordinances, customs, laws and usages of the City.

45. The City and its police department participated in a pattern of acts and omissions of improper supervision, failure to train, failure to discipline, and failure to establish protocols and safety measures to protect citizens against behavior known to them to be high risk, particularly the use of excessive force.

46. As a result of the absence of any adequate supervision, training, monitoring, or discipline of their officers, including Mangan, Mr. Amusat was deprived of his constitutional rights.

47. There was no justification or excuse in the law for the City's failure to address or investigate information regarding improper, illegal, and/or dangerous conduct by members of its police force.

48. The City knew or should have known that its police officers had a habit of engaging in excessive force and other inappropriate behavior under the color of law. Accordingly, the City knew or should have known that their failure to take appropriate action would increase the likelihood that a police officer would engage in such conduct.

49. Consequently, the City's conduct deprived Mr. Amusat of his federal constitutional rights.

50. The Lawrence Police Department has a documented history of officers using excessive force against community residents. For example:

- In 2007 Officer Kyle Wilcox was fired and was later criminally convicted of assaulting two males while in police custody.

- In 2008, the City paid $55,000 to settle with a couple who alleged that Officer Claudio Camacho threw the individuals to the ground, pepper sprayed them, beat and struck them and slammed them up against a mini-van.

- In 2011, a federal jury awarded $130,000 to a Lawrence resident who accused Officer Kyle Wilcox of beating him after a 2007 arrest.

- In 2011, the City settled a claim for $400,000 to an individual who alleged that Officer Carl Farrington punched him in the eye and fractured bones while he was in a holding cell.

• In 2015, a female Lawrence resident alleged that Officer Claudio Camacho pepper sprayed her, punched her in the face, threw her to the ground and banged her head against the pavement following a 2013 arrest.

51. In recent months, other Lawrence police officers have allegedly engaged in aggressive and threatening conduct, lawlessness, insubordination, criminal conduct or conduct unbecoming of a police officer:

• In August 2022, Lawrence Police Captain Maurice Aguiler was placed on leave for being aggressive and argumentative at a private event.

• In September 2022, Lawrence Police Detective Shaun McLellan was placed on leave following an incident where he was charged with domestic assault and battery in Salem, New Hampshire.

• In September 2022, Lawrence Police Detective Paul MacMillan was placed on leave after he demanded a meeting with the Mayor and threatened to go to the Mayor's house if he did not get the meeting.

• In January 2023, Lawrence Police Chief Roy Vasque was placed on paid administrative leave after defying orders from the Mayor's office. Approximately six months later, Chief Vasque reached an agreement with the City to not return to duty and to retire from the police department.

52. The City's response to this incident illustrates its indifference to police officers' use of excessive and unreasonable force.

53. As described above, public employees made efforts to cover up Mangan's conduct or to delay Mangan's conduct from coming to light.

54. The City allowed Mangan to continue working at the police department for nearly two months after the incident with Mr. Amusat. The City's announcement of Mangan being placed on paid administrative leave took place only after information of the incident began to enter the public domain.

55. Mangan has not been arrested or criminally charged for his violent, unprovoked attack on Mr. Amusat.

## Count I
### Common Law Assault and Battery
### (Against Defendant Mangan)

56. The above paragraphs are incorporated by reference.

57. Defendant Mangan committed an assault and battery on Mr. Amusat as described above.

58. Mangan intended to cause and did cause Mr. Amusat to suffer apprehension of an immediate harmful and unwanted touching.

59. Mangan intentionally applied force to Mr. Amusat's body in a harmful or offensive manner and Mr. Amusat did not consent to the touching.

60. As a direct and proximate result of Mangan's tortious conduct, Mr. Amusat suffered damages.

## Count II
### Intentional Infliction of Emotional Distress
### (Against Defendant Mangan)

61. The above paragraphs are incorporated by reference.

62. Mangan intentionally inflicted emotional distress and personal injuries upon Mr. Amusat by engaging in the extreme and outrageous conduct discussed above.

63. Mangan knew or should have known that his conduct would likely result in severe emotional distress, pain and suffering, mental anguish, severe humiliation, embarrassment and/or other damages.

64. As a direct and proximate result of Mangan's tortious conduct, Mr. Amusat was injured and suffered damages.

**Count III**
**Negligent Infliction of Emotional Distress**
**(Against Defendant Mangan)**

65. The above paragraphs are incorporated by reference.

66. Mangan negligently inflicted emotional distress and personal injuries upon Mr. Amusat by engaging in the extreme and outrageous conduct discussed above.

67. Mangan knew or should have known that his conduct would likely result in severe emotional distress, pain and suffering, mental anguish, severe humiliation, embarrassment and/or other damages.

68. As a direct and proximate result of Mangan's tortious conduct, Mr. Amusat was injured and suffered damages.

**Count IV**
**Violation of 42 U.S.C. § 1983 – Unreasonable Use of Force**
**(Against Defendant Mangan)**

69. The above paragraphs are incorporated by reference.

70. Mangan was acting under color of law in dealing with Mr. Amusat during the booking process.

71. As described above, Mangan used unreasonable and excessive force against Mr. Amusat.

72. Mangan's violent and unnecessary takedown of Mr. Amusat was unreasonable because it was clearly motivated by his anger and frustration with Mr. Amusat.

73. Mangan's violent and unnecessary takedown of Mr. Amusat was not done for any other reason to handcuff him and forcibly restrain him.

74. Mangan's fierce and cruel conduct violates clearly established law because Mr. Amusat was not a threat to Mangan or any other police officers in the police station.

75. Mangan's use of unreasonable and excessive force deprived Mr. Amusat of his clearly established right to be free from the use of unreasonable force under the Fourth Amendment of the United States Constitution.

76. Mangan's actions were taken with reckless disregard for Mr. Amusat's constitutional rights.

77. As a direct and proximate result of Mangan's actions, Mr. Amusat was injured and suffered damages.

### Count V
### Violation of 42 U.S.C. § 1983 – Municipal Liability
### (Against Defendant City of Lawrence)

78. The above paragraphs are incorporated by reference.

79. The City allowed the policies and customs described above to exist within its police department.

80. These policies and customs of the City allowed Mangan to believe that he could engage in egregious misconduct and the use of unreasonable force against Mr. Amusat with impunity.

81. The policies and customs of the City were the moving force behind the actions that resulted in the violations of Mr. Amusat's civil rights.

82. As a direct and proximate result of the City's actions, policies and customs, Mr. Amusat was injured and suffered damages.

## Prayers For Relief

WHEREFORE, the Plaintiff Sodiq Folarin Amusat requests that this Court:

1. Award compensatory damages;

2. Award punitive damages against Defendant Mangan;

3. Award the costs of this action, including reasonable attorney's fees; and

4. Award such just and further relief as this Court deems just and appropriate.

## Jury Demand

Plaintiff Sodiq Folarin Amusat hereby demands a trial by jury on all counts so triable.

Respectfully submitted,

SODIQ FOLARIN AMUSAT,
By his attorney,

_____
Matthew J. Koes | BBO No. 668682
M. KOES LAW, LLC
340 Union Avenue
Framingham, MA 01702
(508) 598-7060
mkoes@mkoeslaw.com

Dated: July 18, 2023.